UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| Immanuel Price, | Case No.: 16cv1174-CAB-KSC |
| Plaintiff, | |
| v. | **ORDER REGARDING MOTION FOR SUMMARY JUDGMENT [Doc. No. 96]** |
| J. Wiese, | |
| Defendant. | |

On December 6, 2019, Defendant J. Wiese filed a motion for summary judgment. [Doc. No. 96.] On December 23, 2019, Plaintiff Immanuel Price filed an opposition to the motion. [Doc. No. 99.] On February 5, 2020, Defendant filed a reply to the opposition. [Doc. No. 100.] For the reasons set forth below, the motion is GRANTED.

## ALLEGATIONS OF FAC

In the First Amended Complaint ("FAC"), Plaintiff alleges that on February 28, 2014, he and his spouse "got into altercation" and then Plaintiff left the residence. [Doc. No. 50, at p. 3.] Plaintiff claims he walked around "trying to burn off the heavy intoxication" and returned to the residence around 2:00 a.m. *Id.* Plaintiff then "passed out" on the ground floor rest room." *Id.*

Plaintiff alleges he was "awakened by scratching at the bathroom door" around 3:00 a.m. *Id.* When no one spoke, Plaintiff yelled, "I'm in here!" and claims that the

bathroom door was then kicked off of its hinges, hitting him in the head. *Id.* Plaintiff alleges that "a dog followed by two officers rushed into the bathroom ordering Plaintiff to the ground." *Id.* Plaintiff claims the dog was not on a leash and bit his left hand. *Id.* Plaintiff claims that "[o]ne officer dropped his full weight on to plaintiffs back," and he "pleaded that the officers 'get the dog'" because "the dog had by that time had gained a crushing lock on Plaintiff's right forearm." *Id.* Plaintiff claims the dog was restrained after officers handcuffed Plaintiff. *Id.*

Plaintiff claims that the first dog bite "caused a long gash on Plaintiff's left index finger which flesh hung out of," and the second bite "caused several puncture wounds to the right forearm." *Id.*

Although the FAC is not verified, in opposition to the motion for summary judgment Plaintiff has filed a declaration stating that the FAC is "true and correct." [Doc. No. 99 at 12.]

## REQUESTS FOR ADMISSIONS

Defendant argues that Plaintiff failed to timely respond to Defendant's two sets of requests for admissions and, therefore, the facts contained within the requests for admissions should be deemed admitted. [Doc. No. 96-1 at 5.] Plaintiff argues that Magistrate Judge Karen Crawford gave him an extension of time to respond until July 19, 2019; Plaintiff responded to both sets of requests for admissions on July 17, 2019 and, therefore, the responses were timely. [Doc. No. 99 at 2.] Defendant replies that the Magistrate Judge's extension of time only applied to interrogatories and requests for documents, not to requests for admissions. [Doc. No. 100 at 2.]

A review of the docket appears to show a misunderstanding between Plaintiff and the Magistrate Judge regarding his request for an extension of time. On May 3, 2019, Plaintiff filed a "motion for extension of time," wherein he requests more time to "respond to Defendants requests and Interrogatories." [Doc. No. 68.] Plaintiff does not state whether the "requests" are requests for admissions, or requests for production of

documents, or both. On July 3, 2019, the Magistrate Judge issued an order which, *inter alia*, granted Plaintiff's request for an extension of time. Specifically, the order states:

> Plaintiff has also filed a Motion for Extension of Time, in which he requests the Court extend the deadline for him to respond to Interrogatories and Requests for Production of Documents there were propounded by defendant. [Doc. No. 68.] Plaintiff asks that his deadline be extended until after the Court rules on his Second Motion for Appointment of Counsel, discussed *supra*. Plaintiff's Motion for Extension of Time is **GRANTED**. Plaintiff shall serve full and complete responses to the Interrogatories and Requests for Production of Documents no later than **July 19, 2019**.

[Doc. No. 71 at 3.]

It appears the Magistrate Judge interpreted "requests" to mean requests for production of documents. While Plaintiff did not seek clarification of the extension upon receiving the Magistrate Judge's order, given Plaintiff's *pro se* status, this Court declines to deem Plaintiff to have admitted the facts contained in the requests for admission. Therefore, in ruling on this motion for summary judgment, the Court does not consider any evidence submitted on the basis of the requests for admissions.

## OTHER EVIDENCE PRESENTED BY DEFENDANT

On February 28, 2014, when Plaintiff left the residence to purchase cigarettes, the Victim (his wife) fled to a nearby house with her 5-year-old son, while calling 911 for help. Victim frantically told the 911 dispatcher, that Plaintiff beat her and "now he is going to come and kill" her. This information was conveyed to responding officers via the Computer Aided Dispatch (CAD) system. She then identified the Plaintiff by name and date of birth. (Lynch Dec. ¶ 2; Arnold Dec. ¶ 3.)

La Mesa Police Department (LMPD) Officer Arnold was first to respond at 12:12 a.m. Upon arrival, Officer Arnold noted the Victim's face was swelling, and her lips were cut and bleeding. Victim was transported via ambulance to Sharp Memorial Hospital (Hospital), after providing a brief statement indicating Plaintiff struck and kicked her in the head and body. (Arnold Dec. ¶ 3.)

3

16cv1174-CAB-KSC

Officer Arnold secured the Victim's residence, and departed for the Hospital. In securing the residence, Officer Arnold was only able to lock the handle on the security screen door, leaving the main door ajar. (Arnold Dec. ¶ 4.) Sgt. Lynch and Officer Hughes, additional LMPD personnel, remained behind to search for Plaintiff, and surveil the Victim's residence. ( Lynch Dec. ¶ 5; Hughes Dec. ¶ 2.)

At the Hospital, Officer Arnold observed bite marks on Victim's right leg and the left side of her back, in addition to multiple abrasions on her arm. (Arnold Dec. ¶ 5.) Victim told Officer Arnold that Plaintiff became upset with the Victim because she was not providing vaginal and oral sex to his liking. (Id.) Plaintiff demanded Victim continue having sex with him, while he repeatedly punched and kicked her until she was dizzy, and could not stand. Victim ultimately required stitches. (*Id*.) During this initial investigation, Officer Arnold learned from Dispatch that the Plaintiff had an active criminal protective order protecting the Victim from Plaintiff. (*Id.*) It was issued September 11, 2013 and expired September 10, 2016, had been served on Plaintiff, and required Plaintiff to remain 100 yards away from the Victim. (*Id.;* Exhibit 8[1].)

Officer Arnold notified Sgt. Lynch that the Victim had been sexually assaulted, that only the Victim and Plaintiff had keys to the residence and described how the Victim's residence had been secured when he left. (Arnold Dec. ¶ 6; Lynch Dec. ¶ 5.) Victim gave Officer Arnold written consent to search her residence, before having a sexual assault examination completed. (Arnold Dec. ¶¶ 5, 6,7; Exhibit 5- Victim's consent to search.)

In light of the serious criminal charges, LMPD officers, a San Diego Sherriff Department airship and Sherriff's Canine unit searched the area for Plaintiff. (Lynch Dec. ¶ 5.) Several call outs were made via loud speaker over the airship directing plaintiff, by name, to surrender. (*Id.)*

---

[1] Defendant's request for judicial notice of Exhibit 8 is GRANTED pursuant to Federal Rules of Evidence ("FRE") 201.

Having not located Plaintiff, Sgt. Lynch returned to Victim's apartment and found the front patio gate locked, and a pathway to the front door of the residence recently disturbed. Sgt. Lynch tested the security screen door, and found the deadbolt locked, not how Officer Arnold had secured it. Believing Plaintiff had returned to the residence, Sgt. Lynch and additional LMPD officers established a perimeter and requested canine assistance to apprehend Plaintiff. (Lynch Dec. ¶ 5.)

At approximately 5:00 a.m., SDPD Officer Wiese arrived with his canine (Ufo) to assist LMPD. Sgt. Lynch told Officer Wiese and SDPD Officer Populin that Plaintiff was suspected of and would be arrested for committing spousal rape and felony domestic battery injuring the Victim in addition to other possible charges. Officer Wiese learned Plaintiff had been served with a domestic violence restraining order listing the Victim as the protected party, and precluding Plaintiff from having any contact with the Victim. Officer Wiese was also told that Plaintiff was currently on parole and fled during the preliminary investigation. (Lynch Dec. ¶ 6; Wiese Dec. ¶ 3; Populin Dec. ¶3.)

During this briefing, the Victim's consent and house keys were provided to Officer Wiese and Officer Populin to allow them to enter the residence. (Lynch Dec. ¶ 6; Wiese Dec. ¶ 3.) Officer Wiese went to the front of Victim's residence and positioned himself with Ufo, just outside the front door in a surveillance position. Officer Wiese could see portions of the kitchen, the living room, a stairwell, and a closed door inside, but could not see or hear anyone within the residence. (Wiese Dec. ¶ 4; Populin Dec. ¶4.)

From the entryway, Officer Wiese loudly called out to anyone within the residence, announcing Police presence, and directing anyone inside the residence to come out or a dog would be sent in and they could be bitten. After waiting, Officer Wiese heard and saw no response so he again called out loudly, "San Diego Police" and called Plaintiff by name, directing him to come out or a dog would be sent in and he could be bitten. Officer Wiese then paused, waiting for any response and receiving none gave Ufo a command to bark loudly 5-6 times. After Ufo barked into the residence, Officer Wiese gave a third warning that Police officers were outside and anyone within the residence

needed to come outside or a dog would be sent into the residence and they could be bitten. Officer Wiese again waited for a response and receiving none sent Ufo into the residence on a search command. Ufo began searching, and alerted to someone hiding behind the closed door by continually scratching and barking at the door. Ufo remained at the door barking and scratching, while Officer Populin, two LMPD officers, and Officer Wiese entered the residence searching as they moved forward in the hallway until they reached the closed door. (Populin. Dec. ¶ 4; Wiese Dec. ¶¶ 5-7; Hughes Dec. ¶ 2; Lynch Dec. ¶7.)

Standing just outside the closed door, Officer Wiese yelled, "San Diego Police, we know you are in there. Come out with your hands up or you may be bit." Officer Wiese waited at the door for a response, but there was no response and the door did not open. Consequently, Officer Wiese kicked the door by the doorknob forcing it slightly open (Populin. Dec. ¶ 4; Wiese Dec. ¶ 8; Hughes Dec. ¶ 2; Lynch Dec. ¶ 7.) Officer Wiese was able to see Plaintiff in the room trying to block the door the door from opening, however; Officer Wiese did not know whether Plaintiff was armed. (Wiese Dec. ¶ 9; Populin Dec. ¶ 4.)

Plaintiff began pushing the door shut while yelling not to send the dog in and stating that he gave up. However, instead of giving up, Plaintiff continued forcefully pushing against the door, closing it on the officers. Officer Wiese inserted his foot into the opening before Plaintiff was able to close the door and yelled, ordering Plaintiff to back away from the door and put his hands up. Plaintiff continued to yell that he did not want to be bitten, while pushing against the bathroom door in an attempt to close it. Officer Wiese pushed against the door, opening it enough to allow Ufo through. Ufo bit Plaintiff's finger as he pushed in an effort to shut the door shut. Plaintiff jerked his hand away from Ufo, moving further into the bathroom. Ufo followed him and bit Plaintiff's right forearm while pinning him to the vanity as he was trained to do. Officer Wiese immediately entered the bathroom and removed Ufo from the bite as Officer Populin placed handcuffs on Plaintiff. Ufo bit Plaintiff for less than 40 seconds total, allowing

1 Plaintiff to be taken into custody without the use of greater physical force. (Wiese Dec. ¶¶ 10-12; Populin Dec. ¶¶ 4-5.)

Plaintiff was transported to UCSD Hospital for evaluation and treatment of a one-inch laceration to the inside of his left index finger as well as two canine puncture wounds to his right forearm. Plaintiff's wounds were cleaned, and he was released and booked into jail. (Exhibit 10 - Plaintiff's deposition, p. 51:11 - 53:5; Wiese Dec. ¶ 13; Populin Dec. ¶ 6; Exhibit 3- Plaintiff's injury photos.)

Plaintiff's injuries required no stitches. (Exhibit 10 - Plaintiff's deposition, p. 51:11 - 53:5.)

On February 28, 2014, Plaintiff told LMPD Officer Paugh in a post-Miranda interview that he saw police officers outside as he returned to the residence. Plaintiff indicated he later woke up, inside the bathroom, heard a dog barking and scratching at the bathroom door. Plaintiff stated he heard "SAN DIEGO P.D., SAN DIEGO P.D., or LA MESA P.D., and uh, you know, come out with your hands up." Plaintiff goes on to explain that he was holding the door shut while officers were trying to enter because he did not want to be bit. (Arnold Dec. ¶ 7; Paugh Dec. ¶ 4; Paugh Dec. ¶ 4; Exhibit 4- Plaintiff statement, p. 5 line 15 through p. 6 line 14.)

Plaintiff was charged with spousal rape in violation of Penal Code section 262 (a)(1), felony battery on a spouse in violation of Penal Code section 273.5 (a), assault with a deadly weapon by great bodily harm in violation of Penal Code section 245 and disobeying a court order with serious felony strike priors noted. (Exhibit 10 - Plaintiff deposition, p. 67:6 – 69:8.) Plaintiff pled guilty to felony battery on a spouse in violation of Penal Code section 273.5 in addition to other charges and in exchange for a sentence of 31 years in prison. (Exhibit 11 - certified plea agreement.[2])

---

[2] Defendant's request for judicial notice of Exhibit 11 is GRANTED pursuant to FRE 201.

DISCUSSION

A. Legal Standard.

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (*citing Steckl v. Motorola, Inc*., 703 F.2d 392, 393 (9th Cir. 1983)). All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Tolan,* 134 S. Ct. at 1863 (*citing Liberty Lobby*, 477 U.S. at 255).

At summary judgment, the Court may find that officials are shielded from liability under the doctrine of qualified immunity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Mullenix v. Luna*, 136 S. Ct. 305, 208 (2015) (*per curiam*).

B. Constitutional Violation.

A Fourth Amendment analysis of excessive, non-deadly force requires a court to balance the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force

8

16cv1174-CAB-KSC

was objectively reasonable under the circumstances. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1051, 1056 (9th Cir.2003), *citing Graham v. Connor*, 490 U.S. 386, 396 (1989). The objective-reasonableness inquiry under *Graham* is a three—step analysis. *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir.2003); *see also Bryan v. McPherson*, 590 F.3d 767, 2009 WL 5064477, at *2–9 (9th Cir. Dec.28, 2009). First, the court must evaluate the type and amount of force used. Next, it must assess the importance of the governmental interests at stake by considering the factors set out in *Graham*—the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest. Finally, the court must balance the "gravity of the intrusion on the individual against the government's need for the intrusion ...." *Miller*, 340 F.3d at 964. The need for force is at the heart of *Graham*. *Drummond*, 343 F.3d at 1057 (citation omitted). Where there is no need for force, any forced used is excessive. *Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir.2000), *vacated and remanded on other grounds*, *County of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001).

      1.   Type and Amount of Force.

First, the Court must look at the gravity of the intrusion by evaluating the type and amount of force inflicted. *Miller*, 340 F.3d 959, 966 (9th Cir. 2003). In *Miller*, the court found that a dog bite lasting approximately one minute was reasonable, although it was considerable and serious. *Id.* at 964. In *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994), the force was severe where the dog bit Chew three times, and dragged him between four and ten feet, nearly severing his arm. In *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017), the court found that the use of an off-leash canine to search a business for a possible burglary suspect was "moderate" when the dog found and bit the sleeping Lowry, on the face, and requiring three stiches. Here, the Fourth Amendment intrusion was "moderate" because Officer Wiese did not allow Ufo to bite Plaintiff for a prolonged

period or while unattended[3]; instead, Officer Wiese used Ufo for only the minimum time required to locate and subdue Plaintiff, resulting in a minor injury.[4]

2. Government Interests.

Next, the Court considers the government's countervailing interests, especially in light of the *Graham* factors. In *Miller*, the court found that the government has an undeniable, legitimate interest in apprehending criminal suspects and that the interest is even stronger when the criminal is suspected of a felony, holding that such a situation strongly favors the government. 340 F.3d at 964. Here, it is undisputed that Plaintiff was suspected of the serious and dangerous felonies. The Victim had told the 911 dispatcher and the Officers on scene that Plaintiff had beat her and raped her and was coming back to kill her. The Officers observed that the Victim was injured and bleeding, and transported her to the hospital for treatment. Upon investigation, the Officers learned that Plaintiff was at the time on felony parole and had an active criminal protective order protecting the Victim from Plaintiff. Therefore, at a minimum, Plaintiff was suspected of spousal rape[5] and willful corporal injury on a spouse[6], which are serious and violent felonies. Because the crimes Plaintiff was suspected of, ultimately charged with, and convicted of are serious and violent felonies, this *Graham* factor weighs heavily in favor of Officer Wiese.

The most important *Graham* factor is whether a suspect posed an immediate threat to the safety of the officers or others. *Miller*, 340 F.3d at 964; *Bryan v. McPherson*, 590 F.3d 767 2009 WL 5064477 (9th Cir. Dec.28, 2009). In *Miller*, the court held that, from the officer's viewpoint, the plaintiff posed an immediate threat to his safety. 340 F.3d at

---

[3] In the FAC, Plaintiff does not give a time estimate for the duration of the dog bite, and admits the dog was called off as soon as Plaintiff was handcuffed. [Doc. No. 1 at 3.]
[4] Although Plaintiff argues that his injuries were severe, Plaintiff admitted in his deposition that none of the wounds required stiches and he has presented no evidence of any further medical treatment for those wounds.
[5] Cal. Penal Code §667.5(c)(3).
[6] Cal. Penal Code §273.5.

965. The court noted that the officer knew Miller had defied orders to stop and that he was a felony suspect. In addition, the officer knew Miller was hiding in the woods, but the officer did not know where, and he did not know if Miller was armed. The officer knew that Miller remained defiant because he ignored the officer's warning that he was about to release the police dog. *Id.* The court found these and other factors to be "objectively menacing" and to entitle the officer to assume that Miller posed an immediate threat to his safety and the safety of others. *Id*.

In this case, Plaintiff was suspected of felony domestic violence and spousal rape. Plaintiff was in a residence which he was familiar with and it was reasonable for an officer to believe Plaintiff may have access to any variety of tools or weapons which he could use to attack an officer. Moreover, Plaintiff was a felony probationer who posed a threat to the public at large, should he escape. Officer Wiese did not know whether Plaintiff was armed. (Populin. Dec. ¶¶ 3, 7-10; Wiese Dec. ¶¶ 3, 15, 16; Hughes Dec. ¶¶ 3-6 ; Lynch Dec. ¶10) Under these circumstances, it was reasonable for Officer Wiese to be concerned for the safety of the general public, his fellow officers and himself. Thus, this factor weighs heavily in favor of Officer Wiese.

The third *Graham* factor—whether Plaintiff was actively resisting officers or attempting to flee—also weighs in favor of the government. When the force was used in this case, Plaintiff was evading arrest by hiding and refusing to surrender. *See Miller*, 340 F.3d at 966–67. On February 28, 2014, Plaintiff gave a statement to LMPD Officer Paugh and stated he heard "SAN DIEGO P.D., SAN DIEGO P.D., or LA MESA P.D., and uh, you know, come out with your hands up." Plaintiff told Officer Paugh that he was holding the bathroom door shut while officers were trying to enter because he did not want to be bit. (Paugh Dec. ¶ 4; Exhibit 4- Plaintiff's statement p. 6 lines 5-14.) Plaintiff admits that he heard officers announce their presence and direct him to surrender yet he held the bathroom door shut and prevented officers from entering instead of surrendering

as directed. This is actively resisting arrest.[7] As such, this factor weighs heavily in favor of Officer Wiese. (Paugh Dec. ¶ 4; Exhibit 4- Plaintiff statement p. 6 lines 5-14.)

3. The Presence of a Warning.

"[T]he giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284. "[W]arnings should be given, when feasible, if the use of force may result in serious injury." *Id*. Officer Wiese gave three warnings announcing his presence, the presence of Ufo, and instructing Plaintiff to surrender or he may be bitten by the dog. Plaintiff admits that he heard the officers announce the presence of the dog and the orders to surrender. (Paugh Dec. ¶ 4; Exhibit 4- Plaintiff statement p. 6 lines 5-14.)[8] Therefore, it is undisputed that Officer Wiese gave several warnings to Plaintiff. This factor also weighs heavily in favor of Officer Wiese.

4. Balancing the Interests.

The process of balancing Plaintiff's and the government's interests must be undertaken "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Here, the force used was significant, but the government's interests were also great. Although police need not always show that they attempted less forceful means to secure a suspect, such a showing can be relevant to the reasonableness of the force ultimately

---

[7] Plaintiff argues that he never intended to resist arrest and simply held the door shut because he did not want the dog to bite him. However, regardless of what Plaintiff's intentions were, Plaintiff admits that he continued to attempt to force the door shut rather than surrender. [Doc. No. 96, Exhibit 4 – p. 6:5 – 6:7; Doc. 96 – Paugh Dec. ¶4.] Therefore, Plaintiff has admitted resistance.

[8] In his FAC, Plaintiff alleges he heard no warning because he was "passed out." [Doc. No. 1 at 3.] Thus, even if Plaintiff's post-arrest statement is not considered, at a minimum Plaintiff admits that he has no personal knowledge as to whether a warning was given.

12

used. In *Miller*, the Ninth Circuit noted that the officers had used several less intrusive means to apprehend Miller before using the dog: they signaled him with vehicle emergency lights and siren, pursued him in a police car, pursued him on foot, and audibly warned him to surrender or be chased by the dog. 340 F.3d at 966. Under those circumstances, using the dog was "well suited to the task of safely arresting Miller." *Id*.

Officer Wiese identified himself as a police officer and warned any occupants of the residence that he was sending a police dog in and they may be bitten. (Populin. Dec. ¶ 4; Wiese Dec. ¶¶ 5,6,7,8, and 10; Hughes Dec. ¶ 2; Exhibit 4- Plaintiff statement p. 6 lines 5-14; Paugh Dec. ¶ 4) Further, Officer Wiese took control of Ufo immediately upon Officer Populin taking control of Plaintiff's hand, minimizing the amount of contact Ufo had with Plaintiff, thereby minimizing any intrusion into Plaintiff's Fourth Amendment rights. Thus, Officer Wiese took all possible precautions to prevent an unwarranted intrusion of Plaintiff's constitutional rights, and prevented a more serious intrusion, such as the use of a Taser, or having to go hands on to physically restrain Plaintiff, etc. Accordingly, the cut to Plaintiff's finger and puncture to his arm (none of which required stitches or further medical treatment) is outweighed by the reasonable need for the government to apprehend felony suspects.

The Court finds that Officer Wiese did not violate Plaintiff's constitutional rights by using Ufo to assist in Plaintiff's apprehension. Defendant's conduct was reasonable under the circumstances and there was no violation of Plaintiff's Fourth Amendment rights.

C. Qualified Immunity.

The defense of "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *See Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (citation omitted). When considering a claim for qualified immunity, courts consider: (1) whether the facts show that the defendant violated a constitutional right and (2) whether the right was clearly

13

16cv1174-CAB-KSC

established at the time of the defendant's purported misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). "[I]f the answer to either is 'no,' then the officers cannot be held liable for damages." *Glenn v. Wash. Cty.*, 673 F.3d 864, 870 (9th Cir. 2011). Courts are not required to address the two inquiries in any particular order and may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. 808.

As discussed above, the Court finds that defendant did not violate Plaintiff's Fourth Amendment rights. However, even if there was a constitutional violation, that right was not clearly established at the time of the alleged misconduct. Under the second prong of the qualified immunity test, the Court must determine whether Plaintiff's rights against excessive force were clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232, 129 S.Ct. 808. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "[T]he plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.' " *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).

The Supreme Court recently reiterated the principle that " 'clearly established law' should not be defined 'at a high level of generality.' " *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (*citing Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ). Instead, "the clearly established law must be "particularized" to the facts of the case." *White*, 137 S.Ct. at 552. To find that the law is clearly established, the Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate*." S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017) (*quoting Mullenix v. Luna*, ––– U.S. ––––, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) ).

Plaintiff does not provide any precedent to show that the law was clearly established that Officer Wiese could not use a canine under similar circumstances. In fact, there are several Ninth Circuit cases to show that Officer Wiese's actions were reasonable under the circumstances:

> First, in *Lowry v. City of San Diego*, police deployed a dog into an office building at night after an alarm was triggered, expecting to find a burglar in the building. 858 F.3d 1248 (9th Cir. 2017). Instead, the dog found an employee of the business, who had accidentally triggered the alarm, sleeping on a couch; the dog bit her face and injured her lip. *Id*. Second, in *Miller v. Clark Cty*., officers deployed a dog to seize a suspect who was fleeing police on foot through the woods. 340 F.3d 959 (9th Cir. 2003). In both cases, officers had reason to suspect a person had committed a crime but were unable to visually locate the individual. In both cases, officers believed that deploying a dog was necessary to ensure their own safety given that the suspects may have been armed or resisting arrest. In both cases, officers called off the dog as soon as practically possible once the suspects had been seized. In both cases, plaintiffs' challenges to the dog deployment as excessive force failed.

*Bosworth v. City of San Jose*, 18cv5459-NC, 2020 WL 512340, at *11 (N.D. Cal., Jan. 30, 2020)(officers entitled to qualified immunity for use of canine where they had reason to believe that plaintiff had committed an assault and robbery, had a restraining order against him, had previously resisted arrest, and appeared to be intentionally hiding in the house to resist arrest).

Just as in *Lowry, Miller* and *Bosworth*, Officer Weise had reason to believe Plaintiff had committed a violent crime, was unable to visually locate Plaintiff, believed that deploying a dog was necessary to ensure his own safety and the safety of others, and called off the dog as soon as practically possible. Therefore, Officer Weise is entitled to qualified immunity.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

/ / / / /

## CONCLUSION

For the reasons set forth above, the motion for summary judgment is **GRANTED**. The Clerk of Court shall enter judgment for Defendant Wiese and **CLOSE** the case.

**IT IS SO ORDERED.**

Dated: March 6, 2020

_____
Hon. Cathy Ann Bencivengo
United States District Judge